Yuan Li, Esq. (SBN 326609)
Demidchik Law Firm
17800 Castleton St., Ste. 605
City of Industry, CA 91748
Phone: (626) 317-0033
Email: bill@dcklawfirm.com

Attorneys for Defendant
LIREN LAI

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>V.<br>LIREN LAI,<br>Defendant. | Case No.: 4:25-cr-00186-JST-1<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Sentencing Date: October 30, 2026**<br>**The Honorable Jon S. Tigar** |

## I. INTRODUCTION

Liren "Ryan" Lai is a 40-year-old citizen of the People's Republic of China ("PRC") with no prior criminal history of any kind. He grew up in rural poverty in Luoding, Guangdong Province, in a mud-and-clay house without running water or electricity, and as a teenager he was beaten by his father so severely that he lost the hearing in his right ear. PSR ¶¶ 48–49. He went on to build a lawful career and a small warehousing business, to raise two sons, and to support his parents and his 97-year-old grandmother. PSR ¶¶ 50–51, 57–61. The conduct that brings him before this Court arose because officers of the PRC's Ministry of State Security ("MSS"), on whom he and his family depended in China, directed him to relay communications and carry out tasks in the United States. PSR ¶¶ 20, 30. His role was that of an intermediary, and it diminished over time. PSR ¶ 27.

Mr. Lai accepted responsibility. He pleaded guilty on December 12, 2025, more than two months before his co-defendant, Yuance Chen. PSR ¶¶ 2, 5. By the October 30, 2026 sentencing date, he will have spent 490 days in continuous custody. PSR ¶ 4.

The Probation Office recommends a sentence of 48 months. REC at 1. The government recommends 60 months. Gov't Sent. Mem. at 1, 10 (Dkt. 63). The defense respectfully requests that this Court impose a sentence of 24 months, followed by the one-year term of supervised release recommended by the Probation Office, with no fine. A sentence of 24 months is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. Mr. Lai's limited and declining role, the absence of any classified information or identifiable victim, his history and characteristics, the hard time he has already served, the certainty of his removal, and the sentences imposed on comparable defendants, including the 24-month sentence in the very case the government cites, all support this request. Mr. Lai will address the Court personally at sentencing.

## II. PROCEDURAL HISTORY AND SENTENCING FRAMEWORK

Mr. Lai was arrested in Houston, Texas on June 27, 2025, and has remained in custody ever since. PSR ¶ 4. He made his initial appearance in the Southern District of Texas on June 30, 2025, was transferred to this District under Federal Rule of Criminal Procedure 5(c)(3), and made his initial appearance here on August 11, 2025. PSR ¶ 4; Dkt. 12, 17. On December 12, 2025, he pleaded guilty to Count One of the Indictment, charging conspiracy to act as an agent of a foreign government without notice to the Attorney General, in violation of 18 U.S.C. § 371, and Count Two, charging acting as an agent of a foreign government without notice to the Attorney General, in violation of 18 U.S.C. § 951. PSR ¶ 2; Dkt. 41. The counts carry statutory maximum terms of five and ten years, respectively. PSR ¶ 65.

There is no advisory guideline range in this case. No guideline has been promulgated for 18 U.S.C. § 951, and the Probation Office and the government agree that the sentence is governed by the factors set out in 18 U.S.C. § 3553(a). PSR ¶¶ 37, 66; Gov't Sent. Mem. at 4. Mr. Lai has no criminal history points and falls in Criminal History Category I. PSR ¶ 42. The Probation Office further noted that Mr. Lai otherwise satisfies the criteria for the zero-point offender reduction and for a full reduction for acceptance of responsibility, and that "the Court may wish to take these adjustments into consideration in determining a sentence." PSR ¶ 38. Mr. Lai does not seek any offense-level adjustment; he asks only that the Court weigh those circumstances, as the Probation Office suggested, under § 3553(a).

The Probation Office recommends 48 months of imprisonment on each count, to run concurrently, followed by a one-year term of supervised release, and recommends that any fine be waived because Mr. Lai lacks the ability to pay. REC at 1–3; PSR ¶ 63. The government recommends 60 months of imprisonment and three years of supervised release for Mr. Lai, and 48 months for Mr. Chen. Gov't Sent. Mem. at 10.

Both recommendations overstate the punishment this record warrants. The Probation Office's justification rests largely on the seriousness of the offense category rather than on the limited role Mr. Lai actually played. REC at 2. The government begins a full year above the Probation Office, on the premise that "Lai's recruitment of Chen to the conspiracy on behalf of the MSS warrants a more severe sentence than 48 months," Gov't Sent. Mem. at 8, and that the dead drops were payments "in exchange for information related to the national security of the United States," id. at 5. As discussed below, the second premise finds no support in the record of Mr. Lai's own conduct, and the first cannot bear the weight the government places on it. A sentence of 24 months, the sentence imposed in *United States v. Pauken*, a case the government itself offers as a comparator, gives full effect to the mitigation the Probation Office identified, to the record of Mr. Lai's limited and declining role, and to the punishment he has already endured.

## III. ARGUMENT FOR A SENTENCE OF 24 MONTHS

Under 18 U.S.C. § 3553(a), the Court must impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for just punishment and adequate deterrence, and the need to avoid unwarranted sentencing disparities. The following factors demonstrate that a sentence of 24 months satisfies each of these purposes.

### A. The History and Characteristics of the Defendant Warrant Leniency

Liren Lai was born on June 25, 1986, in Luoding, Guangdong Province. PSR ¶ 47. While his parents worked outside the province, he was raised by his maternal grandmother in the rural countryside, in a mud-and-clay house shared with five uncles and five cousins. PSR ¶ 48. He slept on a wooden bed with two of his cousins. There was no running water or electricity; the family relied on a kerosene lamp for light and drew water from a community well. Id. There was never enough food, and he recalls that his grandmother fed him rat meat. He wore his cousins' oversized hand-me-downs and shoes that were too big. Id.

At age seven, Mr. Lai reunited with his parents. PSR ¶ 49. When his grades declined in middle school, his father punished him by striking him on the back and legs with a rattan. Id. When Mr. Lai was thirteen, his father beat him so badly that he lost the hearing in his right ear. He never received medical treatment; he ran away from home for about a week; and he remained deaf in that ear for a year and hard of hearing for two more years before he recovered. Id. The Probation Office identified "the defendant's early separation from his parents and physical abuse from his father" as a factor the Court may consider. PSR ¶ 86; see REC at 2.

Mr. Lai did not repeat that dysfunction. He graduated from high school in 2004, completed a college-level program at the Guangdong Institute of Science and Technology, and later, while

working, earned a bachelor's degree in business management through the Guangzhou self-study center of Xi'an University of Technology. PSR ¶ 57. He worked as an assistant engineer and then as a project manager before founding the warehousing company he ran from 2014 until his arrest. PSR ¶¶ 59–61. He married in 2012 and has two sons; after his 2022 divorce, he remained a close and involved co-parent, and he speaks with his sons every week from custody. PSR ¶ 50. He has long supported animal rescue. PSR ¶ 51. His stated goal is to go home and care for his 97-year-old grandmother: "I want to return home to keep my grandmother company during her last few years on earth." Id.

This history bears directly on the § 3553(a) analysis. A childhood of deprivation and abuse is not an excuse, but it is meaningful context, and the fact that Mr. Lai met that childhood by building a lawful and productive life reflects both reduced culpability and a low risk that he will reoffend. His complete absence of any criminal record points the same way. PSR ¶¶ 39–45. A clean record at the age of forty confirms that the conduct here was an aberration rather than a reflection of who he is.

The government contends that Mr. Lai's history does not warrant leniency because he is educated and had the capacity to earn a lawful living. Gov't Sent. Mem. at 6. But the government's discussion omits entirely the deprivation and abuse that the Probation Office identified as a factor for the Court's consideration, PSR ¶ 86, and Mr. Lai's complete lack of any criminal record. That Mr. Lai built a lawful career despite that childhood is a reason for leniency, not a reason to withhold it.

**B. The Nature and Circumstances of the Offense Reflect a Limited and Declining Role**

The defense does not minimize the seriousness of the offense. At the direction of MSS officers, Mr. Lai relayed information about U.S. military servicemembers and bases and helped facilitate cash payments in the United States. PSR ¶¶ 20–29. He has admitted that conduct under oath and accepts full responsibility for it.

But the Court's assessment of Mr. Lai must rest on his own conduct, and the record establishes that his role was a limited one. Most of his conduct consisted of relaying WeChat communications between Mr. Chen and the MSS. PSR ¶ 22. It was Mr. Chen, not Mr. Lai, who identified the servicemember referred to as "G.B.," gained access to G.B.'s social media, corresponded with him, photographed a military base in Washington state, and filmed inside a Navy recruiting station. PSR ¶ 22(a)–(c), (e). As the PSR reflects, Mr. Lai's "role as an intermediary between the MSS and Chen decreased as Chen had more direct interactions with the MSS and he received direct payments from the MSS into his and his wife's bank accounts." PSR ¶ 27. By then, Mr. Chen was asking the MSS to help with the down payment on a home. Id.

Mr. Lai personally carried out two dead drops. The first, in Seattle in March 2023, was the retrieval of several thousand dollars that he understood to include reimbursement for his own travel and compensation for his own work; it was not a payment to any source. PSR ¶ 25. The second, in Phoenix in May 2025, was a delivery that Mr. Lai "initially turned down . . . given the nature and risk of the operation," and agreed to carry out only "[f]ollowing further discussions with the MSS." PSR ¶ 29. That reluctance must be understood in context. Mr. Lai is a PRC resident whose family's healthcare, business banking, tax matters, travel documents, and even the resolution of a past detention had passed through the hands of the same MSS officers. PSR ¶ 30. A Chinese businessman in that position is not free to tell the MSS no. That he was ultimately paid more for the task does not change the fact that he first refused it. The remaining operations described in the PSR were carried out by others: the January 2022 Bay Area dead drop was conducted by Mr. Chen's wife at Mr. Chen's direction, and the New York pickup was an attempt by another associate. PSR ¶ 23(a), (c).

Nor did Mr. Lai's conduct cause the kind of harm that typically drives sentences in foreign-agent cases. The PSR identifies no victim. PSR ¶ 32. Nothing in the record shows that any classified information was involved: the information Mr. Lai relayed about G.B. was drawn from G.B.'s social media and his social-media communications with Mr. Chen, and the photographs depicted a base and a recruiting station. PSR ¶ 22. The record does not reflect that G.B. held any rank, security clearance, or access to classified information, or that any servicemember was ever recruited. The restaurant project discussed with the MSS was never established. PSR ¶¶ 23, 26.

The PSR also describes a separate operation in which the MSS paid Individual A, a former U.S. government employee, for national-security information, and in which Co-Conspirators 1 and 2 delivered payments and serviced covert communication tools. PSR ¶¶ 13–14, 17–19. Nothing in the PSR's description of Mr. Lai's own conduct connects him to Individual A, to the covert communication tools used in that operation, or to any payment in exchange for national-security information, and none should be attributed to him. Compare PSR ¶¶ 13–14, 17–19, with PSR ¶¶ 20–31.

The government nonetheless characterizes the dead drops Mr. Lai facilitated as payments "in exchange for information related to the national security of the United States," and asserts that the Phoenix payment, which it describes as "tens of thousands of dollars," "would service ongoing clandestine operations in the United States." Gov't Sent. Mem. at 5. The record of Mr. Lai's conduct supports none of that. The PSR describes what he did, not the purpose of the payments, and it confirms that he never encountered the persons who retrieved the cash. PSR ¶¶ 25, 29. The Phoenix payment was $20,000. PSR ¶ 29. The only references in the record to payments for national-security information appear in the PSR's description of the separate Individual A operation. PSR ¶¶ 13, 19. The government likewise argues that Mr. Lai showed "heightened levels of initiative and control, routinely traveling to China to discuss potential operations with MSS leaders." Gov't Sent. Mem. at 9. But Mr. Lai lives in China. PSR ¶¶ 15, 20. Meeting with MSS officers in his own country, at their direction, reflects the leverage they held over him, not initiative.

Finally, the government's request for a higher sentence for Mr. Lai than for Mr. Chen rests on its contention that Mr. Lai brought Mr. Chen into the conspiracy. Gov't Sent. Mem. at 2, 8. Whatever role Mr. Lai played in first relaying the MSS's taskings to Mr. Chen, Mr. Chen did not come to the MSS through Mr. Lai alone. In early 2020, more than a year before the first communications Mr. Lai relayed, Mr. Chen met an MSS officer at a class reunion, accepted his WeChat friend request, and learned that he worked for the MSS. PSR ¶ 16. Mr. Chen had already sought to enlist in both the PRC military and the U.S. military. Id. And Mr. Chen's most serious conduct came after Mr. Lai's role as an intermediary had faded. By the government's own account, it was Mr. Chen who recorded photographs and videos of recruits and sailors inside a Navy recruiting station in 2023, who maintained "targeting packages" on a Navy employee and a retired servicemember, and who traveled to the PRC in 2024 and 2025 to meet MSS officers and receive additional taskings himself. Gov't Sent. Mem. at 3. Mr. Lai cannot fairly be held more responsible than Mr. Chen for conduct that Mr. Chen undertook directly with the MSS after Mr. Lai had been displaced. These are the circumstances of a middleman acting under pressure from his own government's security service, not of a spy who obtained secrets.

**C. The Custody Already Served Constitutes a Substantial Punishment**

Mr. Lai has been in continuous custody since his arrest on June 27, 2025. PSR ¶ 4. By the October 30, 2026 sentencing date, he will have served 490 days, more than sixteen months.

That time has been harder than ordinary custody. Mr. Lai speaks Mandarin and Cantonese, PSR ¶ 58, and has served his entire term in pretrial facilities. He has suffered recurring nosebleeds throughout his detention, PSR ¶ 53 (rhinitis), and although he has complained of them repeatedly, the more limited medical care available in pretrial detention has not resolved the problem. He has been moved between facilities repeatedly, and each transfer has left his family unable to reach him for days at a time. His family members describe the toll this has taken on him and on them. And because he faces removal, any further custodial term would be harder still: a prisoner subject to a final order of removal may not apply earned time credits under the First Step Act, 18 U.S.C. § 3632(d)(4)(E), and noncitizens facing removal are generally not placed in residential reentry centers or home confinement. Each additional month of imprisonment would thus be served on terms more severe than those faced by a citizen defendant.

**D. The Character Letters Describe a Consistent Portrait of Mr. Lai**

The letters submitted on Mr. Lai's behalf, lodged under seal as Exhibits A through G because they contain personal identifying information and information concerning a minor, come from his parents, his former wife, his primary school teacher, a friend of more than twenty years, and former colleagues, and they describe the same person. His primary school teacher, Xu Ming, recalls that when a classmate sprained an ankle, the young Mr. Lai volunteered to bring the boy

his meals and drinking water every day for two weeks. His parents recall that as a teenager he spent an entire winter brewing herbal soaks every night for his grandmother's swollen legs, and that when he found a wallet full of cash on his way to school, he waited nearly an hour for the owner and refused the reward. His friend Zhang Xuan, his classmate and roommate from 2004, writes that when Mr. Zhang injured his hand, Mr. Lai changed his dressings and washed his clothes for half a month; that when Mr. Zhang fell on hard times in 2011, Mr. Lai learned of it from others and, without being asked, repaid a RMB 200,000 loan in full within three days; and that Mr. Lai personally contributed RMB 16,800 to replace the broken food cabinet at a rescue yard that feeds about three hundred stray dogs.

His former colleagues describe the same qualities at work. Long Yunjing, the company's administrative supervisor, recounts how Mr. Lai took charge of a labor arbitration that had left her sleepless, walked her through the evidence and the law, and sat beside her at the mediation; when she later left to care for an ailing relative and fell on hard times, he called her in 2025 and gave her back her job. He Kunjin recalls that when a family emergency took him away from work for a month, Mr. Lai quietly covered his unfinished work and had everything organized for his return. Qiu Xiqiong describes how Mr. Lai trained her as a new graduate and, after she quit on impulse, welcomed her back without reproach.

Two themes run through these letters and bear directly on this case. The first is that Mr. Lai's defining quality is a deep sense of obligation to the people who depend on him: his grandmother, his parents, his sons, his friends, and his employees. That same sense of obligation to his family helps explain how a man with no criminal history became entangled with MSS officers who controlled so much of what his family needed. PSR ¶ 30. The second is that those who know him best do not excuse his conduct. As Mr. Zhang writes, "I have no intention of downplaying the seriousness of his conduct," and "Liren Lai is not a perfect person, but I have personally seen the sense of responsibility, trustworthiness, and goodwill he has shown over a long period." Ms. Long writes that "during this period he has surely reflected deeply on his own wrongdoing." Mr. Zhang has offered Mr. Lai lawful employment upon his return. These letters reflect a strong network ready to support Mr. Lai's reintegration and a low risk that he will reoffend.

**E. The Impact on Mr. Lai's Family**

This case has fallen hardest on Mr. Lai's family. His business is now in his former wife's hands, and his income has ended. PSR ¶¶ 50, 59, 63. His parents are in their seventies, and his grandmother is 97. PSR ¶¶ 47, 51. His former wife, Song Lili, describes how Mr. Lai comforted and encouraged their elder son by telephone through a difficult stretch before his high school entrance examination, and how the boy's first act after gaining admission to the school he wanted was to ask that his father be told. Ex. B.

The toll on the younger son has been severe, and his school has arranged regular counseling to help him cope with his father's absence. Ex. B. In a school composition titled "My Wish," he described coming home to an empty house and concluded that his one wish is "companionship." Id. Every additional month of imprisonment prolongs Mr. Lai's absence from two boys who need him now.

**F. Removal and Post-Sentence Immigration Detention Are Severe Additional Consequences**

Mr. Lai is a PRC citizen who entered the United States on a visitor visa. PSR ¶ 15. As a noncitizen convicted of these offenses, he faces removal and the permanent loss of the ability to return; the Probation Office itself anticipates that he "will likely be deported." REC at 3. The Supreme Court has recognized that deportation is "a particularly severe penalty" and may be "the most important part" of the consequences a noncitizen defendant faces. *Padilla v. Kentucky*, 559 U.S. 356, 364–65 (2010). Mr. Lai does not contest removal and intends to accept it.

For Mr. Lai, the end of a custodial sentence will not mean release. He will be transferred to immigration custody and held until his removal can be effected, which can add weeks or months of further detention. The Probation Office recognizes that "upon release from imprisonment, the defendant will likely be deported and will not be in the United States to be supervised." REC at 3. No purpose under § 3553(a) is served by extending his federal custody beyond what is necessary only to postpone a removal that all parties agree will follow, and to expose him to a second, sequential period of detention.

**G. A Sentence of 24 Months Avoids Unwarranted Sentencing Disparities**

Under 18 U.S.C. § 3553(a)(6), the Court must consider the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct. Defendants who pleaded guilty to acting as, or conspiring to act as, agents of the PRC in cases that did not involve classified information have received sentences at or below the sentence requested here. Dickson Yeo, a Singaporean national who recruited Americans with access to sensitive government information for PRC intelligence, was sentenced to 14 months. See Press Release, U.S. Dep't of Justice (Oct. 9, 2020), https://www.justice.gov/opa/pr/singaporean-national-sentenced-14-months-prison-acting-united-states-illegal-agent-chinese. John Chen, who acted as an unregistered PRC agent and bribed a person he believed to be an IRS agent in a scheme against a U.S.-based religious group, was sentenced to 20 months. See Press Release, U.S. Att'y's Office, S.D.N.Y. (Nov. 19, 2024), https://www.justice.gov/usao-sdny/pr/california-man-sentenced-acting-illegal-agent-prc-government-and-bribery. And Thomas Pauken II, who, in the government's words, worked "at the direction and control of the PRC intelligence services to

recruit human sources in the United States and gather sensitive information," was sentenced to 24 months. Gov't Sent. Mem. at 9; *United States v. Pauken*, No. 1:26-cr-103-LMB (E.D. Va. 2026). The government distinguishes Mr. Pauken on the ground that he presented mental-health mitigation, id., but Mr. Lai presents substantial mitigation of his own, including the childhood deprivation and abuse the Probation Office identified and a role that diminished over time.

The government relies principally on *Peng*, which it calls "a floor." Gov't Sent. Mem. at 8; *United States v. Peng*, No. 4:19-cr-589 (N.D. Cal. Mar. 16, 2020). But the government's description omits the feature that made *Peng* serious. Mr. Peng, a U.S. citizen, served for years as an MSS courier who retrieved SD cards containing classified national-security information at dead drops and carried them to Beijing. Mr. Lai's case involves no classified information at all. That Mr. Peng received 48 months, a figure that by the government's account already reflected his early plea and assistance, Gov't Sent. Mem. at 8, does not make 48 months a floor for a defendant whose conduct never touched classified material. Ping Li, likewise sentenced to 48 months, acted as an MSS "cooperative contact" for more than a decade, including by providing information obtained from his employer. See Press Release, U.S. Att'y's Office, M.D. Fla. (Nov. 2024), https://www.justice.gov/usao-mdfl/pr/florida-telecommunications-and-information-technology-worker-sentenced-conspiring-act. And *Ji Chaoqun*, which the government offers as a "ceiling," Gov't Sent. Mem. at 8–9, involved a defendant convicted after trial who enlisted in the U.S. Army Reserve while acting as an MSS asset and lied about his foreign contacts on a government form. *United States v. Ji Chaoqun*, 107 F.4th 715 (7th Cir. 2024). Mr. Lai pleaded guilty and accepted responsibility. A sentence of 24 months, the sentence imposed in *Pauken*, places Mr. Lai squarely within the range of comparable non-classified cases.

The most direct comparison is Mr. Lai's own co-defendant, who will be sentenced earlier the same day. Mr. Chen's role in the offense was greater than Mr. Lai's in every respect. Mr. Chen had lived in the United States since 2015 and held conditional lawful permanent resident status through his marriage to a U.S. citizen; he had himself sought to enlist in the U.S. military. PSR ¶ 16. It was Mr. Chen who identified G.B., accessed his social media, and corresponded with him into 2024; who surveilled a military base; and who filmed inside a Navy recruiting station. PSR ¶ 22. Mr. Chen dealt directly with the MSS and received its payments directly, PSR ¶ 27, and traveled to the PRC in 2024 and 2025 to receive taskings from MSS officers himself, Gov't Sent. Mem. at 3; he received the covert communications phone, PSR ¶ 25; and his wife carried out the Bay Area dead drop, PSR ¶ 23(a). Mr. Lai, by contrast, was the intermediary whose role faded, and he accepted responsibility first. The government nonetheless asks the Court to sentence Mr. Lai to a full year more than Mr. Chen, Gov't Sent. Mem. at 10, on the recruitment theory addressed above. Whatever sentence the Court imposes on Mr. Chen, Mr. Lai's sentence should be meaningfully lower. The defense will address the sentence imposed on Mr. Chen at the hearing.

## IV. CONCLUSION

Liren Lai is a 40-year-old first-time offender who overcame a childhood of poverty and abuse to build a lawful life and support three generations of his family; who acted as an intermediary for officers of his own country's security service, in a role that diminished over time and involved no classified information; who accepted responsibility before his co-defendant; and who will return to China to care for his family. The recommendations of the Probation Office and the government rest on the seriousness of the offense category and on characterizations the record of Mr. Lai's own conduct does not support. The defense respectfully submits that the full measure of the § 3553(a) factors, including his limited role, his history and characteristics, the hard time already served, the certainty of removal, and the sentences imposed in comparable cases, warrants a sentence of 24 months.

For all of the foregoing reasons, the defense respectfully requests that this Court impose a sentence of 24 months of imprisonment, followed by the one-year term of supervised release recommended by the Probation Office, with no fine.

Date: October 24, 2026

DEMIDCHIK LAW FIRM

By: ______________________

Yuan Li, Esq.
Attorneys for Defendant LIREN LAI